❐ Original

CLERK'S OFFICE
A TRUE COPY
Feb 23, 2022
s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* ) | Case No. |
| The Cellular Telephone Assigned Call Numbers: 630-453-3515 and 323-979-1250, whose service provider is Verizon, a wireless telephone service provider headquartered in New York, New York. ) ) ) ) | **22-M-355 (SCD)** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before          3-9-22          *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m.     ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to          Hon. Stephen C. Dries          .
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of          08/22/2022          .

Date and time issued:          2-23-22 4:30 pm

*Judge's signature*

City and state:   Milwaukee, WI          Hon. Stephen C. Dries U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the following cellular devices assigned call numbers (referred to herein and in Attachment B as the "Target Cell Phones"):

    a.    **262-352-0761**, that is in the custody or control of Cingular Wireless, a wireless telephone service provider headquartered in West Palm Beach, Florida.

    b.    **630-453-3515,** that is in the custody or control of Verizon, a wireless telephone service provider headquartered in Bedminster, New Jersey.

    c.    **323-979-1250,** that is in the custody or control of Verizon, a wireless telephone service provider headquartered in Bedminster, New Jersey.

2.      The Target Cell Phones.

**Particular Things to be Seized**

I.    **Information to be Disclosed by the Provider**

   To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

  a.  The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phones for the time period August 1, 2021, to the present:

    i.  Names (including subscriber names, usernames, and screen names);

    ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.  Local and long-distance telephone connection records;

    iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.  Length of service (including start date) and types of service utilized;

    vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix.    All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phones for the time period August 1, 2021, to the present including:

    a.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b.   information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT")].

b.    Information associated with each communication to and from the Target Cell Phones for a period of 30 days from the date of this warrant, including:

i.    Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

3

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phones will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

c. Information about the location of the Target Cell Phones for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of Target Cell Phone #2 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

4

ii.     This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

## II.     Information to be Seized by the Government

All information described above in Section I that will assist in the investigation of **Samuel MOORE** and others regarding violations of Title 21, United States Code, Sections 841(a)(1) and 846.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in these Warrants.

5



CLERK'S OFFICE
A TRUE COPY
Feb 23, 2022
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Cellular Telephone Assigned Call Numbers: 630-453-3515<br>and 323-979-1250, whose service provider is Verizon, a wireless<br>telephone service provider headquartered in New York, New York. | )<br>)<br>)<br>)<br>)<br>) | Case No. **22-M-355 (SCD)** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 846 and 841(a)(1) | Conspiracy to distribute marijuana and distribution of marijuana |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☑ Delayed notice of  180  days *(give exact ending date if more than 30 days:* 08/22/2022 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**ATF Special Agent Sean Carlson**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means)*.

Date:  2/23/22

_____
*Judge's signature*

City and state:  Milwaukee, WI

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR SEARCH WARRANT EXTENSIONS

I, Sean Carlson, being first duly sworn, hereby depose and state as follows:

## **INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for search warrant extensions under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers as follows (collectively, the Target Cell Phones):

a.      **262-352-0761**, whose service provided is Cingular Wireless, a wireless telephone service provider headquartered in West Palm Beach, Florida.

b.      **630-453-3515,** whose service provider is Verizon, a wireless telephone service provider headquartered in Bedminster, New Jersey.

c.      **323-979-1250,** whose service provider is Verizon, a wireless telephone service provider headquartered in Bedminster, New Jersey.

The Target Cell Phones are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute marijuana and distribution of marijuana) have been committed, are being committed, or will be committed by **Samuel MOORE**, and others (collectively the Target Subjects), including, but not limited to the user of cellular phone number **262-352-0761 (Richard ROARK)**, the user of cellular phone number **630-453-3515 (Daniel ARROYO)**, and the user of cellular phone numbers 773-636-6335 **and 323-979-1250 (Samuel MOORE)**, and other known and unknown coconspirators.

3.      The Court has jurisdiction to issue the proposed warrants because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

4.      Because these warrants seek the prospective collection of information, including cell-site location information, that may fall with the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The requested warrants therefore include all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

5.      The Affiant is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  I have been so employed since November 2015 and I am currently assigned to the Milwaukee Field Office.  Prior to my employment at ATF, I was a Patrol Officer at the Hammond Police Department in Hammond, Indiana for over four (4) years.

6.      As a Special Agent, I have participated in the investigation of firearms and narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, and weapons. As a firearms investigator, I have interviewed many individuals involved in firearm and drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, analysis of phone and financial records, and arrests of

2

numerous drug traffickers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. Through training and experience, I have performed countless hours of physical and digital surveillance and am aware that suspects will often take evasive action or employ methods to attempt to inhibit law enforcement's attempt to detect and monitor their illegal activities

7. Through training, experience, and discussions with other experienced agents:

8. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States.

9. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

10. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances.

11. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name

3

of that subscriber; I also know that drug dealers tend to frequently change phone numbers in an attempt to avoid law enforcement detection.

12.     I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business.

13.     I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them.

14.     I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence.

15.     I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control.

4

16.     I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers and/or other electronic devices, currency counting machines, and telephone answering machines/voicemail to generate, transfer, count, record and/or store the information described in the items above, as well as to conduct drug trafficking activities.

17.     I know that drug traffickers often use social media accounts to further their drug trafficking and money laundering activities.

18.     I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency.

19.     I know drug traffickers commonly maintain addresses or telephone numbers in books, papers or electronically that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization.

20.     I am personally involved in the investigation of the offenses discussed in this affidavit and I am familiar with all aspects of this investigation. The statements contained in this affidavit are based on my knowledge and, in part, information provided by LEOs, including (a) my personal knowledge and observations derived from participation in this investigation; (b) review of oral and written reports that I have received directly or indirectly from other law enforcement officers about this and other drug-trafficking investigations; (c) discussions I personally had concerning this investigation with other experienced drug-trafficking

investigators; (d) physical surveillance by the DEA, ATF , and North Central HIDTA, the results of which have been reported to me directly or indirectly; (e) public records; (f) review of telephone toll records, pen register and trap and trace information, and telephone subscriber information; (g) information provided by confidential sources working for local law enforcement officers, the DEA and North Central HIDTA; (h) review of driver's license and automobile registration records; (i) records obtained from law enforcement databases; (j) my training and experience as an ATF Special Agent; and (k) the training and experience or other law enforcement officers involved in this investigation; (l) United States Postal service records; and, (m) and the public portion of the Target Subjects' social media accounts.

21.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

### A.  Background

22.     Since at least 2018, narcotics investigators in southeastern Wisconsin identified **Samuel A. MOORE (M/W, XX/XX/1999)** as a large-scale drug trafficker. Specifically, in 2018 a confidential source (CS) provided information that **MOORE** was selling large amounts of marijuana in the Milwaukee, Wisconsin area.

23.     Case agents are aware that in January 2019, United States Postal Service Office of the Inspector General (USPS OIG) Special Agent (SA) Edward O'Dwyer and Milwaukee Police Department Detective (Det.) Eugene Nagler identified a group of individuals from California and

6

Wisconsin, to include **Samuel A. MOORE** that have been sending high grade marijuana and marijuana derivatives through the U.S. mail. The controlled substances are sent from California to southeastern Wisconsin, including Milwaukee, and the Chicagoland area.

### 1. Parcel Seizures

24.     On February 22, 2019, SA O'Dwyer conducted routine parcel screenings at the Milwaukee mail processing annex, located at 7620 South 10th St., Oak Creek, Wisconsin. Special Agent O'Dwyer observed a suspicious United States Postal Service (USPS) Priority Mail parcel displaying tracking number 9505 5125 0644 9051 1685 58.  The parcel in question bore a handwritten label addressed to "Brittany Corl, 3005 W. Maryland Ave., Milwaukee, WI 53211," and postmarked on February 20, 2019, in Los Angeles, California 90057.  A search of a law enforcement database revealed that the destination address contained a fictitious name.

25.     On February 22, 2019, SA O'Dwyer met with Milwaukee Police Det. Eugene Nagler and his narcotics canine "Flora" at the Milwaukee mail processing annex.  Together, Det. Nagler and "Flora" are a certified Police Narcotics Detection Team accredited through the Indiana Law Enforcement Training Academy in the detection of controlled substances and other controlled substances made with like components. Once at the annex, "Flora" indicated and alerted to the subject parcel.

26.     As a result, on February 25, 2019, SA O'Dwyer applied for and received a federal search warrant for the subject parcel, issued by U.S. Magistrate Judge Nancy Joseph, Magistrate Number 19-833M(NJ). On the same date, the subject parcel was searched pursuant to the above-referenced warrant.   Det. Nagler located two packages of suspected marijuana weighing approximately 1,025 grams (with packaging). The suspected marijuana was field tested by Det. Nagler and tested positive for THC, the active ingredient in marijuana.

7

27.     On February 25, 2019, upon opening the subject parcel pursuant to the search warrant, Det. Nagler discovered one (1) package of suspected marijuana weighing approximately 505 grams (w/packaging). The suspected marijuana was field tested by Det. Nagler which tested positive for the presence of THC.  Det. Nagler subsequently connected the package mailed by **Samuel MOORE** to **Richard ROARK** (**M/W, DOB XX/XX/1996**).  Det. Nagler reviewed United States Postal records and video surveillance in Los Angeles, California for the shipment of the package which depicted **Samuel MOORE** mailing the instant package, and the package described below, at the Los Angeles California Post Office. As stated, one of the packages identified as suspicious from this shipment sent by **MOORE** was addressed to 3005 N. Maryland Avenue, Milwaukee, Wisconsin. Previously case agents identified Brianna KNIGGE (W/F, DOB XX/XX/1999), who resided at 3005 N. Maryland Ave., Milwaukee, Wisconsin, as **ROARK's** girlfriend. A review of open-source databases accessible to Det. Nagler further revealed that **Richard ROARK** previously resided at 12765 W. Hampton Ave., Butler, Wisconsin which is the shipping address for several other identified suspicious packages.

28.     Additionally, case agents know that on February 22, 2019, SA O'Dwyer located another suspicious package while conducting routine parcel screenings at the Milwaukee mail processing annex, 7620 S. 10th St., Oak Creek, Wisconsin 53154. This suspicious USPS Priority Mail parcel displayed tracking number 9505 5125 0644 9051 1685 41 and bore a handwritten label addressed to "Tyler Alvin Mass, 12765 W. Hampton Ave., Butler, WI 53007."  This parcel bore a February 20, 2019 from Los Angeles, California 90057.  A search of a law enforcement database determined that the destination address also contained a fictitious name.

29.     Again, on February 22, 2019, at the postal annex, "Flora" indicated and alerted to the subject parcel. On February 25, 2019, SA O'Dwyer applied for and received a federal search

warrant for the subject parcel which was issued by U.S. Magistrate Judge Nancy Joseph, Magistrate Number 19-834M(NJ). On February 25, 2019, upon opening the subject parcel pursuant to the search warrant, Det. Nagler located one package of suspected marijuana weighing approximately 505 grams (with packaging). The suspected marijuana was field tested by Det. Nagler and tested positive for the presence of THC.

30.     Additionally, on May 30, 2019, United States Postal Inspector (USPI) Tyler Fink conducted routine parcel screenings at the Milwaukee Processing and Distribution Center (P & DC), located at 345 W. St. Paul Avenue, Milwaukee, Wisconsin 53203. This inspection revealed a suspicious parcel identified as United States Postal Service Priority Mail Express parcel EE503582065US. The shipping label for the subject parcel indicated it was sent from Coco & Eve, 801 S. Olive St., #804, Los Angeles, CA 90014." The parcel bore a handwritten label addressed to "Jocelyn Rogers, 12765 W. Hampton Ave., #201, Butler WI 53007," and a May 28, 2019 postmark from Los Angeles, California 90017.

31.     After searching a law enforcement database, Inspector Fink located a phone number for the origin address, 213-277-5060, and made contact with an employee of the Atelier Apartments who identified himself only as "Michael." "Michael" stated that he did not recognize the name of the sender and gave consent to search the subject parcel. Upon opening the subject parcel, Inspector Fink discovered eight (8) vacuum sealed plastic bags containing suspected THC vape cartridges with a total gross weight of approximately 5,070 grams which field tested positive for the presence of THC. Believing this package to be connected to Det. Nagler's investigation into previously seized packages of marijuana, Inspector Fink turned these items over to Det. Nagler. Det. Nagler is aware that the address 12765 W. Hampton Ave., #201, Butler,

9

Wisconsin 53007 was previously identified as a recipient address for controlled substances sent from California to Wisconsin.

32.     Through a review of United States Postal records and video surveillance collected in Los Angeles, California, case agents were able to identify and connect **Samuel A. MOORE** to the above-mentioned subject parcels sent through the mail.

**2.   Cash seizure from MOORE**

33.     On Sunday July 28, 2019, Milwaukee County Sheriff Deputy Daniel Schlueter, assigned to the Milwaukee County Sheriff Office Airport Division at the Milwaukee Mitchell International Airport in the City of Milwaukee, was contacted by the Transportation Security Agency (TSA).  A TSA official informed Deputy Schlueter that an individual carrying a large amount of U.S. currency made conflicting and suspicious statements at the screening station.

34.     Deputies Mazruczak and Schlueter responded to the security screening station and spoke with the lead screening agent who gave the following account. An individual identified as **Samuel A. MOORE** came through the screening station carrying a medium sized bag with a shoulder strap. During the screening process, the screening agents identified a very large amount of bulk cash. **MOORE** stated to the TSA agents, "Well it's my dad's stuff." **MOORE** indicated that he knew the cash totaled roughly $100,000 dollars; however, **MOORE** reiterated that the contents of the bag belonged to his father.  Investigators had previously identified **MOORE**'s father as Daniel T. MOORE (W/M, DOB XX/XX/1969). Pursuant to TSA policy, TSA officials photographed **MOORE**'s boarding pass, a Southwest flight to California, and identification. TSA officials then allowed him to proceed to the gate. Based upon this information, the deputies located **MOORE**. Upon arrival they spoke briefly to **MOORE** who attempted to walk away,

10

stating he wasn't going to take that flight. **MOORE** was detained by the deputies and escorted to the Sheriff's Office substation at the airport.

35.     A pat down of **MOORE** revealed that **MOORE** possessed a wallet that contained two (2) additional identification cards. A review of the additional identifications revealed that they were forged and false. **MOORE** possessed an Arizona driver's license listing the name "Charles Harvey Peterson, XX/XX/1996, 2619 E. Pinchot Avenue, Phoenix, AZ 85016." The picture depicted on the driver's license did not match **MOORE**.

36.     **MOORE** also possessed a New Jersey driver's license listing the name "Samuel Preston **MOORE**, XX/XX/1997, 232 Nord Beach Road, Jersey City, NJ 08242," depicting a photograph matching **MOORE**. Because **MOORE** possessed two false identifications, and at the time he was only nineteen years old, **MOORE** received a Milwaukee County citation, for forged/ falsified identification card by underage person.

37.     As a result of this stop, on July 28, 2019, Homeland Security Investigations (HSI) Special Agent Johnathan Cerf seized approximately $102,000.00 in cash and an Apple iPhone from **Samuel A. MOORE** at the Milwaukee airport.

38.     On August 5, 2019, case agents secured a search warrant for **MOORE**'s Apple iPhone. As the result of technical issues, only a partial extraction of the phone occurred. During review of the partial download, Det. Nagler observed a color photograph of a large amount of green plant material suspected to be marijuana, a color photograph of a large quantity of a yellow substance believed to be marijuana wax, a color video and picture of an individual believed to be **Samuel A. MOORE** displaying a large amount of U.S. currency in a vehicle. Based upon his training and experience, Det. Nagler is familiar with the appearance of marijuana, marijuana wax, THC crumble and other marijuana products.

### 3. Confidential informant information and a controlled buy

39.     In November of 2019, a confidential informant (CI-1) reported to a detective assigned to the Washington County Drug Task Force that **Samuel A. MOORE** was distributing large quantities marijuana in the Milwaukee and Washington County areas.

40.     Case agents are aware that CI-1 was arrested by police for maintaining a drug trafficking house and provided the information after arrest in the hopes of receiving consideration on pending and/or potential charges. Law enforcement authorities are aware that CI-1 has no prior convictions.  Case agents believe that CI-1 is truthful and reliable because information provided by CI-1 has been corroborated by other independent aspects of the investigation.

41.     Thereafter in January 2020, case agents received additional information from the Washington County Drug Task Force that a West Bend resident, **Samuel A. MOORE**, believed to be currently residing in Los Angeles, California, routinely posts photographs and videos on social media of marijuana, THC vape cartridges, Promethazine with Codeine, firearms, as well as large quantities of U.S. currency. **MOORE** posts on Snapchat and Instagram indicating the narcotics are for sale and that he can be contacted through Snapchat and/or Instagram to place an order for controlled substances.

42.     Through this investigation, case agents are aware that **MOORE** utilized the Instagram account "imsam - ID 1637476506," and posts frequently depicting images and videos of illicit drugs, firearms, and large sums of U.S. currency.  **MOORE** utilizes to the platform to advertise product that either he, or others operating under this control, have available for sale.

43.     On March 1, 2021, a confidential informant (CI-2), working under the direction of law enforcement, arranged to purchase five pounds of crumble (i.e., a marijuana product

12

containing THC concentrates) from **MOORE**. Case agents are aware that CI-2 was arrested by police for misdemeanor resist/obstruct offenses and bail jumping. These cases remain open and CI-2 is working with law enforcement for consideration in these open cases. After arrest, CI-2 provided information about **MOORE**. Law enforcement authorities are aware that CI-2 has prior convictions for traffic and municipal ordinance offenses. Affiant believes CI-2's information is truthful because it has been corroborated by other aspects of this investigation.

44.     The controlled purchase between CI-2 and **MOORE** was arranged using **MOORE**'s Instagram account "imsam - ID 1637476506." Through the account "imsam - ID 1637476506," **MOORE** provided both a price and location for the transaction. Specifically, **MOORE** directed CI-2 to the area of S. 6th Street and Virginia Street, Milwaukee, Wisconsin, and instructed CI-2 where to park. Thereafter, **MOORE** informed CI-2 that a white pick-up truck would arrive to deliver the crumble. A short time later a white pick-up truck arrived at the location, and an unknown individual distributed the crumble. CI-2 further related that after the transaction, **MOORE** video chatted with CI-2 making sure CI-2 received the five pounds of crumble and was satisfied. Case agents subjected a sample of the crumble to a field test and received positive results for the presence of Tetrahydrocannibinols (THC), the active ingredient in marijuana, with a weight of 2,650 grams.

45.     On March 1, 2021, shortly after the above-described controlled purchase of the THC crumble, City of Milwaukee police officers observed the same white pick-up truck, bearing Wisconsin license plate PA5800, driven by a white male, later identified as Kyle BRICKNER (W/M, DOB XX/XX/1998) leave the controlled purchase of THC crumble at 539 W. Virginia Street, Milwaukee, Wisconsin. The officers observed the white pick- up truck drive south on South 5th Street, then west on West National Avenue, and south on South 6th Street before

entering the parking lot for the Mercantile Lofts, 611 W. National Avenue, Milwaukee, Wisconsin. Based upon their training, experience and familiarity with the investigation, case agents believe that BRICKNER engaged in counter surveillance maneuvers to avoid law enforcement detection.

46.     The officers observed BRICKNER exit the white pick-up truck with a small red shoulder bag and enter the building from the south entrance door. A short time later BRICKNER exited 611 W. National Avenue from the south building entrance door, carrying a tan plastic "Pick 'n Save" shopping bag, and re-entered the white pick-up truck. Officers observed BRICKNER drive back to 539 W. Virginia Street. A second white male later identified as Austyn HOCH, who was already parked at 539 W. Virginia Street, exited his vehicle and entered the front passenger side of the white pick-up truck. HOCH and BRICKNER met for a short period inside the vehicle before HOCH exited the truck and reentered his vehicle. BRICKNER, driving the white pick-up truck, returned to 611 W. National Avenue, and entered the building via the south building entrance door.

47.     A short time later, after meeting with BRICKNER, law enforcement authorities arrested HOCH who was in possession of one pound of THC crumble.

**B.  Richard ROARK as the user of 262-352-0761**

48.     On May 7, 2020, Det. Nagler spoke to a source of information (SOI-2) who provided information about drug trafficking between Los Angeles, California and Milwaukee, Wisconsin.[1]  SOI-2 stated s/he knew of a group of young men who were distributing THC vape cartridges, THC edibles, slabs (THC wax) and flower (marijuana) through the social media

---

[1] SOI-2 is a citizen witness who has no pending charges, no criminal history and has not been remunerated for the information.  SOI-2 voluntarily provided the information to law enforcement, believing it was the right course of action.  Case agents believe SOI-2 is truthful and reliable because SOI-2's information was corroborated through independent police reports, open-source databases and social media.

platforms Instagram and Snapchat. SOI-2 identified **Samuel MOORE** and **Richard ROARK** as the main individuals involved in these activities. SOI-2 stated **ROARK** instructed **MOORE** in the method of both utilizing social media to advertise the product and using the U.S. postal system for distribution. SOI-2 stated that on a daily basis **MOORE** and **ROARK** each posted videos and photographs of marijuana, cash and firearms on Instagram, and shipped the drugs to customers nation-wide through the U.S. postal system. SOI-2 stated **ROARK** has more money than **MOORE**. SOI-2 also related that **ROARK** and **MOORE** had a falling out in 2019 over money.

49. SOI-2 also informed Det. Nagler that **ROARK** owns a home in Butler, Wisconsin. Case agents later determined that **ROARK's** home address is 13625 Hampton Rd., Brookfield, Wisconsin. In part, SOI-2 explained **ROARK** lives with his girlfriend, **Brianna KNIGGE,** at the residence in Butler. SOI-2 provided **ROARK**'s cell phone number, **262-352-0761**, to Det. Nagler.

50. In addition to providing information on KNIGGE**,** SOI-2 also stated **ROARK** previously dated Abigail LASKOSKI (W/F, DOB XX/XX/1997). SOI-2 explained that when the relationship ended, LASKOSKI vandalized the windows of **ROARK's** Cadillac Escalade. Det. Nagler located an April 23, 2019, Brookfield Police Department report for disorderly conduct, with the address of the offense listed as 13625 Hampton Rd., Brookfield, Wisconsin. Case Agents' review of the Brookfield police report revealed that **ROARK** was listed as the victim and stated that he owned the residence at 13625 Hampton Road. **ROARK** further identified **262-352-0761** as his phone number. A further review of the reports revealed that Brianna KNIGGE was present during the incident, and the report described her as **ROARK**'s current girlfriend. KNIGGE identified her address as 3005 N. Maryland Avenue. As indicated

above, case agents are aware that suspicious parcels shipped by **MOORE** had previously been sent to that address.

51.     Additionally, the Brookfield police department report listed Abigail LASKOSKI's home address as 8890 Green Meadow Lane, Greendale, Wisconsin. Case agents are aware that during the course of this investigation, at least one (1) package deemed to be suspicious by investigators had been received at that address.

52.     On April 14, 2020, Washington County Circuit Court Judge Sandie Giernoth authorized a search warrant for Instagram content pertaining to **MOORE's** "imsam - ID 1637476506," account. On May 19, 2020, Det. Nagler reviewed the search warrant return data received for that account.   Det. Nagler observed communication between "imsam - ID 1637476506," and an account identified as belonging to **ROARK,** "imrocochet – ID 176706666," approximately thirty-seven (37) times between January 2019 through March 2020. In one specific interaction between **MOORE** and **ROARK**, **ROARK** wrote, "Literally made you 100k in months and you shady towards me."  "Imsam" responded, "If I made 100 offu u must've made 150-200 off me." Shortly thereafter, **ROARK** requested to buy marijuana; however, **MOORE** responded that it was all gone.

53.     On January 6, 2021, Milwaukee County Multijurisdictional Drug Enforcement Group Police Officer (PO) Marlin Schilcher spoke to a confidential informant (CI-3) who was arrested for possession of a controlled substance with the intent to distribute THC and is working in hopes of garnering consideration related to those charges. CI-3 has four (4) open felony cases and has prior traffic ticket convictions.  Case agents believe CI-3 is truthful and reliable because information provided by CI-3 has been corroborated by multiple sources through open records searches as well as case agents' specific case knowledge.

16

54.     CI-3 stated that individuals named **Samuel MOORE**, **Richard ROARK** and Antonio M. ANGUIANO (H/M, DOB XX/XX/1997) were distributing marijuana. CI-3 stated **ROARK** was **MOORE's** "right hand man." CI-3 further explained that **ROARK** was supplying the "Young Paid Niggas," a Milwaukee based street gang, and **MOORE** was supplying another Milwaukee based street gang, the "Wild 100's." CI-3 further related that Antonio "Tony" ANGUIANO was one of **MOORE's** largest customers. CI-3 indicated that ANGUIANO's family owns a tow truck company where ANGUIANO stored product and proceeds of his drug dealing. CI-3 explained the tow truck company was on the boarder of Milwaukee and Menomonee falls. CI-3 also explained that ANGIANO rented an apartment in the Moderne building, located at 1141 N. Old World Third Street, Milwaukee, Wisconsin, and another apartment at 777 Apartments, located at 777 N. Van Buren Street, Milwaukee, Wisconsin. CI-3 also explained that **ROARK** had or has a place in Menomonee Falls.

55.     Additionally, on January 6, 2021, CI-3 stated that in the past he/she has received Instagram videos from **MOORE**, **ROARK** and ANGUIANO which depicted them with large amounts of marijuana and U.S. currency. CI-3 related that all three use Instagram to traffic drugs. CI-3 also stated that s/he has communicated will all three via Instagram utilizing the application's voiceover IP feature which allows users to place phone calls within the application. CI-3 stated **ROURK** sells a large quantity of marijuana and utilizes ANGUIANO to facilitate the deals.

56.     On approximately January 29 or January 30, 2021, a publicly visible Instagram post on "imsam - ID 1637476506," **MOORE**'s Instagram profile, depicted **ROARK** and **MOORE** snowmobiling together in Minocqua, Wisconsin.

17

57.     On April 20, 2021, United States Magistrate Judge Stephen C. Dries authorized a search warrant for the Instagram profile "imsam - ID 1637476506."  Case agents received the return from Instagram on May 11, 2021.  Between November 2020 and March 2021, Det. Nagler located approximately thirteen (13) contacts between **MOORE** and the Instagram profile "imricochet – ID 176706666," the known Instagram profile of **ROARK,** some of which case agents believe are drug related (i.e., "28 to me," and "Send me 5 for 10k").

58.     Additionally, during the course of this investigation ATF Financial Investigator Michael Zeihen located credit card activity for **ROARK** on June 1, 2021, in the amount of $309.31 which occurred in Schoolcraft County (Michigan). Det. Nagler searched public and law enforcement databases for Schoolcraft County (Michigan) and found a record indicating **ROARK** purchased property at 316 Wolf St., Manistique, Michigan on September 11, 2020, for $50,000.

59.     On September 2, 2021, case agents obtained an administrative subpoena for utility records at 316 Wolf St., Manistique, Michigan.  A review of the subpoena return revealed that as of September 16, 2020, the utilities at 316 Wolf St, Manistique, Michigan 49854 are in the name of **Richard C. ROARK**.  The return also listed **262-352-0761** as **ROARK's** phone number. In addition to subscriber information, the return revealed a "High" rate of power consumption. Based upon their training, experience and familiarity with the investigation, case agents are aware that high electrical usage is an indicator that a building is being utilized to house a marijuana grow operation.  Case agents are further aware that marijuana grow operations use an above-average level of electricity to operate the grow.

60.     On September 7, 2021, case agents obtained an administrative subpoena for toll records and subscriber information related to **262-352-0761** which revealed that **Richard C. ROARK** is the subscriber for this number.

61.     On December 15, 2021, the Honorable Nancy Joseph, United States Magistrate Judge, authorized search warrants for telephone numbers **262-352-0761 (ROARK**), **630-453-3515 (ARROYO)**, 773-636-6335 **("Cali Cartel drug phone**), and **323-979-1250 (MOORE)**. In part, the warrants authorized case agents to obtain positional data for these phone numbers. On January 14, 2022, the warrants expired.

62.     On December 27, 2021, at approximately 8:00 p.m., case agents' review of positional data for cell phone **323-979-1250**, used by **Samuel MOORE**, revealed that the phone left the Chicago area and headed north. The phone continued traveling north until it reached the area of 13625 Hampton Rd., Brookfield, Wisconsin, the previously identified home address of **Richard ROARK**.

63.     At approximately 9:20 p.m. on this same date, case agents' review of positional data for **262-352-0761,** used by **ROARK,** was also in the area of 13625 Hampton Rd., Brookfield, Wisconsin. Both the phone used by **ROARK** and the phone used by **MOORE** were registering off the same cellular tower.

64.     On December 27, 2021, at approximately 9:30 p.m., while both phones were located in the same area, Det. Nagler observed an unknown white auto and a white Cadillac SUV in the driveway at 13625 Hampton Road.   **ROARK's** residence is located in a rural area and the driveway is unlit.  At the time of the instant surveillance, it was dark and Det. Nagler was only able to identify the vehicles.

19

65.     At approximately 9:52 p.m., Det. Nagler observed the white Cadillac Escalade leave the driveway at 13625 Hampton Rd., Brookfield, Wisconsin and head east on Hampton Road. Det. Nagler followed the Escalade east bound on Hampton Road. While following the Escalade, Det. Nagler was able to note the license plate on the white Cadillac Escalade, AGG4633, which lists to **Richard ROARK, Jr.** The Escalade continued east, then went north on HWY 41/45. Det. Nagler then discontinued physical surveillance. A review of positional data for **262-352-0761, ROARK's** phone, revealed that the phone left the area during the period that Det. Nagler followed the white Escalade.

66.     Det. Nagler returned to 13625 Hampton Rd., Brookfield, Wisconsin and observed the aforementioned unknown white auto remained parked in the driveway.

67.     At approximately 10:13 p.m., the Escalade, registered to **ROARK**, returned to 13625 Hampton Rd., Brookfield, Wisconsin. A short time later, the unknown white auto left the driveway of 13625 Hampton Rd., Brookfield, Wisconsin. Positional data confirmed that **323-979-1250, MOORE's** phone, left the area at the same time the unknown white auto left the area. After leaving the area of **ROARK**'s house, case agents' review of positional data for **323-979-1250** revealed the phone traveled directly back to Chicago, Illinois.

68.     Later, on December 27, 2021, **MOORE** posted a publicly visible video to his Instagram account "100bandbrand" that depicted **MOORE** driving in a vehicle with a large amount of U.S. currency visible on his lap. Based upon case agents training and experience, and familiarity with the investigation case agents believe **MOORE** met with **ROARK** to collect drug proceeds, which he then displayed on social media to increase his reputation and elevate his status.

20

69.     On January 13, 2022, HIDTA analyst Martin Wilson conducted a telephone toll analysis of **262-352-0761.** In part, the analysis revealed that between December 4, 2021 and January 4, 2022, approximately forty-two (42) contacts occurred between **262-352-0761** and **323-979-1250,** the number associated with **Samuel MOORE.**

70.     On January 15, 2022, the Waukesha County Drug Stoppers received an anonymous drug tip stating that **Richard ROARK** was utilizing a warehouse location, located in very close proximity to his home, to store and sell large quantities of marijuana. At the time of this complaint, investigators were unaware of this warehouse location.

71.     On January 24, 2022, the Honorable Stephen Dries, United States Magistrate Judge, authorized search warrants for telephone numbers **262-352-0761 (ROARK)**, **630-453-3515 (ARROYO)**, and **323-979-1250 (MOORE)**. In part, the warrants authorized case agents to obtain positional data for these phone numbers. On February 23, 2022, the warrants expire.

72.     On February 9, 2022, Det. Nagler, was able to locate **ROARK's** aforementioned Cadillac Escalade, utilizing positional data collected for **262-352-0761,** the number associated with **ROARK.** Det. Nagler observed the vehicle at **ROARK's** known residence. A short time later, Det. Nagler followed the vehicle as it drove eastbound on Hampton Road, then northbound on north 126th Street. At this point, Det. Nagler lost sight of the vehicle and conducted a search of the adjacent blocks, where he observed **ROARK's** Cadillac Escalade parked in front of an unmarked tan one story brick warehouse, with large white overhead garage door, located at 5206 N. 126th Street, Butler, Wisconsin.

73.     Det. Nagler observed that the warehouse has dark window tinting taped to the inside of all windows, seemingly to prevent people outside from seeing into the building. Det. Nagler observed that at the time he observed the vehicle parked in front of the warehouse, the

location data for **262-352-0761** had moved from the area of **ROARK's** residence, and registered on the tower that covered the area of this warehouse. Additionally, Det. Nagler had previously identified this general area because the positional data for **ROARK's** phone would frequently ping on the tower located in this area; however, Det. Nagler had not previously identified the warehouse location. Finally, case agents are aware that this warehouse is located approximately three minutes, by vehicle, from **ROARK**'s residence.

74.     Through **MOORE's** social media posts, case agents were aware that **MOORE** was in Columbia from January 6, 2022, to February 14, 2022. Because **MOORE** was out of the country, location data and toll activity for **MOORE's** line was not reported to investigators during this time. Further toll analysis for **262-352-0761** revealed that **MOORE** contacted **ROARK** immediately upon his return to the United States on February 14, 2022.

75.     On February 16, 2022, Det. Nagler was monitoring location data for **323-979-1250**, the number associated with **MOORE.** At this time, Det. Nagler observed the phone move from the Chicagoland area northbound toward Wisconsin. Established surveillance in the area of **ROARK's** house, located at 13625 Hampton Rd., Brookfield, Wisconsin, in anticipation of a possible meeting between **MOORE** and **ROARK.** At approximately 1:39 p.m., using the positional data for **ROARK's** phone, I located **ROARK** at the previously identified warehouse, located at 5206 N. 126th Street, Butler, Wisconsin. At approximately 1:48 p.m., a silver pick-up truck, parked in front of the warehouse and a white male walked into the front door of the building. At 1:54 p.m., **ROARK** and the unknown white male exited the warehouse, and **ROARK** locked the front door with his keys. The unknown male walked back to his truck and left the area.

22

76.     At 1:55 p.m. I observed a white Volkswagen (VW) Sedan (unknown model; unknown plate) pull up next to **ROARK's** previously identified Cadillac Escalade SUV in the driveway of the warehouse.  When the driver of the white VW white sedan momentarily stepped outside of the vehicle to talk to **ROARK**, I observed that **MOORE** was driving the white VW sedan. A short time later, **MOORE** and **ROARK** both drove away. I am familiar with the appearance of both MOORE and ROARK.   Furthermore, to date other than marijuana trafficking, case agents have been unable to identify any business occupation for either **MOORE** or **ROARK.**

77.     At approximately 2:00 p.m., I observed **MOORE**, driving the white VW sedan, back into the driveway at **ROARK's** residence, located at 13625 Hampton Rd., Brookfield, Wisconsin.  I observed **MOORE** park in the garage at 13625 Hampton Road.  Approximately 30 seconds later, I observed **ROARK,** driving the white Cadillac Escalade SUV, pull into the driveway and park.  I then observed **MOORE** and **ROARK** enter the residence.

78.     On February 17, 2022, HIDTA analyst Martin Wilson conducted a telephone toll analysis of **262-352-0761.**  In part, the analysis revealed that between January 21, 2022, and February 17, 2022, approximately four (4) contacts occurred between **262-352-0761** and **323-979-1250,** the number associated with **Samuel MOORE.**

79.     On February 19, 2022, I conducted electronic surveillance of the previously identified warehouse associated with **ROARK,** located at 5206 N. 126th Street, Butler, Wisconsin.  At approximately 1:43 p.m., I observed **ROARK** walk to the front door and unlock it with keys.   A short time later an unknown white male, wearing a light-colored hooded sweatshirt pulled up over his head (bearing the same height and weight as **MOORE**) exited **ROARK's** Cadillac Escalade and walk inside the warehouse.  Approximately one minute later,

23

an unknown white male, driving a navy blue pick-up truck, parked in front of the warehouse on the street, and walked into the warehouse through the front door.

80.     At approximately 1:47 p.m., I observed the unknown white male exit the warehouse through the front door carrying a white bag.  The unknown white male entered his navy blue pick-up truck and left the area.  A short time later, I observed both **ROARK** and the white male believed to be **MOORE** exit the warehouse.  **ROARK** locked the door to the warehouse with a key, and both individuals reentered **ROARK's** vehicle and left the area. Based upon my training and experience, I believe that this meeting was  consistent in length of time with a narcotics transaction.  Analysis of locational data collected for **262-352-0761,** the number associated with **ROARK,** and **323-979-1250,** the number associated with **MOORE,** revealed that both phones were registering on cell towers that covered the warehouse's location at the time of this meeting.

81.     Based upon your affiant's training, experience, and familiarity with the investigation, inclusive of the toll analysis, **262-352-0761** is presently active and used to facilitate **ROARK's** drug activity.

82.     Case agents' analysis of the positional data collected for **262-352-0761**, the phone used by **ROARK**, has assisted case agents to confirm through **ROARK's** movements that **ROARK** continues lack legitimate employment/income.  Additionally, case agents were able to utilize locational data collected for **ROARK's** phone to locate the warehouse referenced in the anonymous drug tip, which **ROARK** appears to be utilizing for his drug operation.  Analysis of the positional data collected has revealed several instances where the positional data for **262-352-0761**, **ROARK's** phone, was registering on the cell phone tower covering this newly

identified warehouse location. Finally, the positional data for **ROARK's** phone has significantly assisted case agents' physical surveillance of the targets.

### C. Daniel ARROYO as the user of 630-453-3515 and Samuel MOORE as the user of 773-636-6335[2]

83. In December of 2020, investigators observed **MOORE** post a photo on his Instagram "imsam - ID 1637476506" depicting **MOORE** with **Daniel ARROYO** (W/M, DOB XX/XX/1994), with a listed location of Miami, Florida.

84. On March 14, 2021, a review of electronic surveillance placed **Samuel MOORE**'s Cadillac Escalade CVY7433, at 5423 Garden Grove Ave., Tarzana, California. While at the residence, **MOORE** posted a video to his Instagram account "imsam - ID 1637476506" depicting an individual holding a large quantity of banded U.S. currency while standing by a distinctly shaped in-ground pool. Investigators observed a high white privacy fence with the text "Cali plays hit different... tap in LA" overlayed on the video. Open-source aerial photographs displayed the pool and fence depicted in the above-mentioned video as a match for the pool and fence located in the backyard of 5423 Garden Grove Ave., Tarzana, California. Additionally, a review by case agents' of the above-mentioned Instagram search warrant return for **MOORE's** profile "imsam - ID 1637476506" revealed numerous posts made by **MOORE** at the 5423 Garden Grove Avenue address. In these posts, investigators have observed large quantities of narcotics, cash and firearms.

85. On March 15, 2021, Det. Nagler conducted an open-source database search and identified the telephone number **630-453-3515** as associated with **Daniel ARROYO**.

---

[2]Through telephone toll analysis of 773-636-6335, case agents determined that the "Cali Cartel" phone recently incurred little drug trafficking activity. Consequently, case agents are not seeking a warrant for 773-636-6335. Instead, case agents' review of telephone data for **323-979-1250** revealed that the bulk of **MOORE's** drug trafficking telephone activity shifted to **323-979-1250**.

Subpoenaed subscriber information confirmed that **Daniel ARROYO** subscribes to **630-453-3515**. Additionally, several open-source databases list **Daniel ARROYO** as living at 5423 Garden Grove Ave., Tarzana, California.

86.     On April 3, 2021, while in Los Angeles, **MOORE** made public Instagram posts to the "imsam - ID 1637476506" account, depicting a bottle of what appeared to be promethazine / codeine with the text "SWIPE UP WILL GO FAST 2600 NOT TAKING A DOLLAR LESS." On that same date, **MOORE** posted to the "imsam - ID 1637476506" account two (2) videos depicting a large amount of suspected raw marijuana.

87.     On April 18, 2021, **MOORE** posted to the "imsam - ID 1637476506" several videos where **MOORE** stated that "the team" had purchased land which would be utilized as a marijuana grow in the countryside outside of Los Angeles. Using electronic surveillance, case agents determined that parcel of land is located at 23200 Grimsel Drive, Tehachapi, California 93561. On May 5, 2021, **MOORE** made additional posts to social media while at the property where **MOORE** stated the land would be used as a grow operation to help the business supply more product.

88.     On June 30, 2021, **MOORE,** utilizing the account "imsam - ID 1637476506," stated that they "closed on the property after three months." Det. Nagler searched the Kern County California website and determined that the property located at 23200 Grimsel Drive, Tehachapi, California 93561 was sold on June 30, 2021 to William KAMINSKI and Cristina ALVEREZ for $320,000. A review of records related to the sale revealed that the buyers put down $120,000 in cash.

89.     HIDTA Analyst Martin Wilson analyzed telephone records related to **ARROYO's 630-453-3515** number. This review revealed consistent contact with the telephone

26

number 312-593-1698. Case agents obtained an administrative subpoena for toll records and subscriber information related to 312-593-1698. This examination revealed that Cristina ALVEREZ was the subscriber. Additionally, the subpoena return listed William KAMINSKI as the "financial liability party" for 312-593-1698. Det. Nagler located a 2009 Naperville, Illinois police report where Christina ALVEREZ-ARROYO (H/F, DOB XX/XX/1976) is identified as the mother of **Daniel ARROYO.** In this same report, William L. KAMINSKI (DOB XX/XX/1967) identified **Daniel ARROYO** as his son.

90.     On April 24, 2021, Det. Nagler located two (2) public video posts on **MOORE's** Instagram account "imsam - ID 1637476506." The videos depicted **MOORE** remotely watching video footage captured from a Ring doorbell. The Ring video footage depicted two (2) subjects whom **MOORE** refers to as "Pig 1 and Pig 2" with the text "This is what a controlled deliver looks like. Paid 20 bucks an hour to be chumps doing bitch work." Det. Nagler was able to identify one of the individuals in the above-mentioned ring doorbell video as United States Postal Inspector (USPIS) Tom Lynch. Det. Nagler spoke to Lynch's partner, DEA TFO Mike O'Connor who stated the video in question was an attempted controlled delivery of a suspicious USPS mail package (bearing tracking number EJ699199011US, mailed on April 22, 2021, from Tarzana, California, 91356). TFO O'Connor stated the package in question was addressed to "**Danny ARROYO**, at 737 W. Washington Blvd, Chicago, IL 60661, Unit 3006" and the package had a return address of "Santiago Martinez, 5421 Garden Grove, Tarzana, CA 91356." The suspicious parcel is more particularly described as requiring $360.25 in postage, measuring approximately 24 inches by 17 inches by 15 inches, and weighing approximately 54 pounds and 14 ounces.

27

91.     On April 26, 2021, USPIS Thomas Lynch obtained a federal search warrant for the suspicious mail parcel. The parcel was opened pursuant to the search warrant and was found to contain ten (10) one (1) pound boxes of THC wax with a gross weight of 28.4 kilograms.

92.     Further investigation revealed that the return address listed on the package as 5421 Garden Grove, Tarzana, California is fictitious, and in very close proximity to **ARROYO's** Tarzana, California address.

93.     Within the timeframe of the package's shipment, the investigation revealed that **MOORE** and **Daniel ARROYO** were regularly together at 5423 Garden Grove Ave., Tarzana.

94.     On April 27, 2021, **MOORE** posted public videos to the Instagram profile "imsam - ID 1637476506." Several videos depicted a large amount of apparent THC edibles on a table as well as a hand-written note containing a list of suspected marijuana strains available for purchase.  On that same date, **MOORE** posted to the "imsam - ID 1637476506" account a video depicting seven (7) different large plastic bags containing suspected raw marijuana buds.  The bags displayed labels in front detailing the purported strain of marijuana contained within each bag.

95.     On May 3, 2021, **MOORE** made more public Instagram posts to the "imsam - ID 1637476506" account. Several videos also depicted a large amount of suspected raw marijuana available for purchase.  Similarly, **MOORE** posted another video depicting a large amount of suspected raw marijuana and a large amount of U.S. currency being counted on a gold money counting machine.  Based upon their training, experience and familiarity with the investigation, case agents believe that the contents of the video suggested that the cash represented proceeds generated from the sale of marijuana.

96.     On May 10, 2021, **MOORE** posted to the public Instagram account "imsam - ID 1637476506" four (4) videos which depicted a large quantity of different strains of suspected raw marijuana and purported THC edibles displayed in high rise apartment in Los Angeles.  Case agents have previously observed that **MOORE** routinely advertises this apartment as a "store" where customers are able to purchase his products.  From June 11 through June 13, 2021, **MOORE** continued to post similar public videos to the Instagram profile "imsam - ID 1637476506."

97.     From July 8 through July 13, 2021, **MOORE** continued to make drug related public Instagram posts to the "imsam - ID 1637476506."  One specific video depicted a large amount of U.S. currency with a gold money counter.  Case agents also observed a large black garbage bag and plastic "totes" containing suspected marijuana in this video.  Over this same time-period, **MOORE** posted a screenshot of the "Cali Connected / CHI connected" Telegram social media account.  The screenshot depicted a menu of available THC products; that is, photographs and videos of suspected marijuana and prices.

98.     From July 28 through August 9, 2021, **MOORE** made the following posts to the Telegram social media "Cali Connected / Chi Connected" account.[3]  In sum, **MOORE** provided the following information in these posts.  **MOORE** stated his Instagram and Snapchat are deleted and he is no longer doing business through either Instagram or Snapchat; and **MOORE** provided the phone number 773-636-6335 and directed customers to use this number to demonstrate proof of cash on hand for drug purchases via Apple Facetime video.  Additionally, **MOORE** stated that transactions require a $10,000 minimum and further explained that he would be increasing it to a $20,000 minimum.  Finally, **MOORE** stated that individuals showing $100,000 will be

---

[3] Telegram is an online messaging application that functions similar to other popular messaging applications such as WhatsApp and Facebook Messenger.  Telegram offers end-to-end encryption for the "secret chat option," thus providing more security in communications.

provided with another phone number to call. **MOORE** also posted several times where he displayed different grades/strains of marijuana, THC wax and THC concentrates with the corresponding cost per pound.

99.     Also in July 2021, **MOORE** posted a photo to the Instagram profile "imsam - ID 1637476506" depicting several individuals.  The photograph (see below) is captioned, "Love my team. Cheers to health and wealth," and is location tagged as Las Vegas, Nevada. Case agents identified the individuals in the photograph as **Samuel A. MOORE**, **Daniel ARROYO** and Danielle LEONARDI, whom investigators have previously identified as the girlfriend of **ARROYO**. Additionally, case agents located a public post on the separate Instagram profile "danielleleoo," corresponding to a photograph of Danielle LEONARDI**,** who is wearing the same dress and sleeves as in the "love my team" photo posted by **MOORE**. Investigators located publicly visible posts on this account where LEONARDI is with **ARROYO.**  Based upon their familiarity with the investigation, case agents are aware that **MOORE** is not engaged in any legitimate business.



100.     On August 27, 2021, **MOORE** made a series of posts to an account on the social media application Telegram, named "Cali Connected / Chi Connected." The posts depicted a menu of product available labeled "Chicago menu," where **MOORE** stated he had approximately fifty (50) pounds of product available for purchase. **MOORE** provided the phone number 773-636-6335 with the caption, "To place order facetime with cash in hand or you will be hung up on."[4]

101.     Case agents are aware that 773-636-6335 previously served as the "Cali Cartel" drug line **MOORE** had advertised on a daily basis through the Telegram account "Cali connected / Chi connected." Case agents are aware that Telegram allows users to change group

---

[4] Case agents had access to this account through an undercover Telegram account.

names, and **MOORE** sometimes renames this group "Cali Connected / Chi connected." On this account, **MOORE** routinely directs callers to utilize Apple Facetime with money in hand or "they are hung up on."

102.     Case agents are also aware that Telegram provides users the ability to designate "admin" members who have the ability to edit and post under the account.  A search of the "contact card" for the Telegram account "Cali Cartel" displays "**Danny ARROYO"** as a designated "Admin" for this account.  Attached below is a screenshot of the "Cali Cartel" account displaying **Daniel ARROYO** as an Admin for the account.  The screenshot also depicts a post made by **ARROYO** on July 2, 2021, where **ARROYO** posted a photo of suspected raw marijuana with the caption, "Updated Menu."



103.     On September 8, 2021, **MOORE** posted to the Telegram account "Cali connected / Chi connected" states "more indoor PLATINUM BUBBAS, super sticky great nose even better

smoke! These are first come first serve these are slightly even better then the last in my opinion as far as smoke and smell. Still great color super frosted and caked up. Call or text that number to place an order Again there's only 50 available Chicago ACT FAST CALL OR TEXT." **MOORE** also posted, "773-636-6335 is back active text or call now to place order I was not receiving texts or calls thanks."

104. On December 6, 2021, the Chicago Police Department (CPD) investigated a burglary where witnesses observed three unknown subjects removing items from 1959 W. Superior, Unit 3, Chicago, Illinois. When police responded they found the unit unoccupied with an open door. During the course of their investigation, CPD Officers located a large amount of suspected marijuana (raw buds, and approximately 900 boxes containing THC vape cartridges) and a Taurus firearm. CPD then subpoenaed the rent roll and lease documents pertaining to 1959 W. Superior, Unit 3, Chicago, Illinois. The building's management provided the lease to CPD. Case agents' review of the lease revealed that Unit 3 was leased by **Daniel ARROYO**, with a listed phone number of **630-453-3515.** The lease was signed on October 18, 2021 and is valid until October 31, 2022.

105. On December 10, 2021, HIDTA Analyst Martin Wilson conducted toll analysis for 773-636-6335, **MOORE's** previous drug line, on data collected from August 2, 2021 to November 28, 2021. Analysis of 773-636-6335 activity revealed approximately three contacts with Danielle LEONARDI, the known girlfriend of **Daniel ARROYO**, one contact with **Daniel ARROYO**, and two contacts with a phone registered to Morski Brands, employer of **Daniel MOORE, MOORE's** father.

106. On January 13, 2022, HIDTA Analyst Martin Wilson conducted toll analysis for **630-453-3515** using data collected between February 12, 2021 to January 13, 2022. Analyst

Wilson determined **630-453-3515** had approximately thirty-one telephonic contacts with phone numbers associated with **Samuel MOORE**, four contacts with **773-636-6335,** associated with the "Cali Cartel" Telegram activity and **MOORE**, and one contact with a number associated with Morski Brands who employs Daniel T. MOORE**, Samuel MOORE's** father.

107.    On January 30, 2022, review of positional data for **630-453-3515** revealed that **ARROYO's** cell phone registered on towers in the area of Trump Towers in Chicago Illinois. An Instagram post by **ARROYO's** girlfriend (Danielle LEONARDI) described a stay at Trump Tower Chicago, Illinois during the same time period.

108.    On February 1, 2022, a review of positional data for **630-453-3515**, **ARROYO's** cell phone, revealed that at approximately 7:30 a.m. the cell phone registered on cell towers in the area of O'Hare International Airport.

109.    Later that same date, a review of electronic surveillance revealed that **ARROYO's** cell phone was located in the area of Los Angeles, California.

110.    On February 2, 2022, a review of positional data for **630-453-3515** revealed that between 4:00 p.m. and 7:00 p.m., on numerous occasions the cell phone traveled from Sherman Oaks, California to downtown Los Angeles, California.  The cell phone registered on towers covering the area of 1200 S. Figueroa, which case agents have previously identified as the Circa apartments associated with **MOORE**.

111.    On February 3, 2022, at approximately 11:30 a.m., a review of positional data for **630-453-3515** revealed that the phone registered on a tower covering the 23200 Grimsel Drive, Tehachapi, California area.  The phone remained in this area until approximately 5:30 p.m., when it returned to the Sherman Oaks Area.   It should be noted, investigators have previously

34

identified this address as a large parcel of land which was purchased by **MOORE** and **ARROYO** to serve as a large-scale marijuana grow operation.

112. On February 17, 2022, HIDTA Analyst Martin Wilson conducted toll analysis for **630-453-3515** using data collected between January 21, 2022, and February 21, 2022, which revealed **ARROYO** had one contact with **MOORE** on **323-979-1250** on February 15, 2022.

113. As noted above, **MOORE** was located in Columbia from January 6, 2022, through February 14, 2022. Therefore, **630-453-3515**, the cell phone associated with **ARROYO,** had minimal contact with the cell phone associated with **MOORE** because **MOORE** was out of the country.

114. On February 11, 2022, Det. Nagler learned of a Chicago Illinois police report taken that same date, listing **Daniel ARROYO** as the victim of an armed robbery. The report listed the address of 401 N. Wabash Ave., 46E Chicago, Illinois for **ARROYO,** and identified **630-453-3515** as his phone number. The complaint stated an unknown male produced a handgun and took **ARROYO's** luggage as he was leaving Trump International Hotel & Tower Chicago, then fled in a silver and black Mercedes. According to the report, **ARROYO** left the scene before police arrived. Based upon their training and experience, case agents believe that this was a targeted robbery of a drug trafficker, in part, because **ARROYO** did not cooperate with law enforcement.

115. Case agents' review of the positional data collected for **630-453-3515** revealed that the phone registered off a cell phone tower in the direct area of 401 N. Wabash Ave., Chicago, Illinois, during the armed robbery. A review of the positional data further revealed that **ARROYO's** phone left the area of 401 N. Wabash Ave. and traveled to O'Hare International

35

Airport. Positional data also revealed that the cell phone registered at the Los Angeles International Airport, Los Angeles, California, later in the day.

116. Case agents' use of the positional data collected for **630-453-3515** has assisted the investigation through the identification of an area in Sherman Oaks California where **ARROYO** has been staying with his girlfriend Danielle LEONARDI. Investigators have also observed **ARROYO's** phone in the area of **MOORE's** purported grow operation on numerous occasions.

**D. Samuel MOORE as the user of 323-979-1250**

117. On December 27, 2021, Det. Nagler used the positional data for **323-979-1250,** the number associated with **MOORE,** to physically surveil a meeting between **MOORE** and **ROARK**, at **ROARK**'s residence in Brookfield, Wisconsin. The details of that meeting are detailed above.

118. On September 2, 2021, the Honorable Judge Nancy Joseph signed a Federal search warrant for the Instagram profile "imsam - ID 1637476506." Investigators received the return from Instagram on September 14, 2021**.**

119. On September 15, 2021, HIDTA Analyst Martin Wilson analyzed data contained in the Instagram return for the profile "imsam - ID 1637476506." In the analysis, Analyst Wilson located eighteen (18) instances where **MOORE** provided the number **323-979-1250** to people during drug related communications on Instagram. In one specific interaction which occurred on June 27, 2021, **MOORE** provided **323-979-1250** to user "@6papo-ID 149258107." During the conversation with "imsam - ID 1637476506," "@6papo-ID 149258107" stated @6papo-ID 149258107 will be in Los Angeles and wanted to place a $10,000 order. **MOORE** provide this Instagram user with **323-979-1250** as a contact number.

36

120.    On September 15, 2021, DEA TFO Joseph Scheuring served an administrative subpoena to Verizon Wireless for toll data and subscriber information related to **323-979-1250.** The subpoena return revealed that the phone was a prepaid account, which contains no subscriber information. Your Affiant is aware through training and experience, it is common for those engaged in drug trafficking to utilize prepaid phones as an attempt to conceal their activities from law enforcement.

121.    On January 13, 2022, Analyst Wilson searched **323-979-1250** against telephone toll data of previously identified phone numbers associated with members of the drug trafficking organization.  Analyst Wilson determined **323-979-1250,** the number associated with **MOORE**, contacted **ARROYO** at the **630-453-3515** number on October 23, 2021.  Analyst Wilson Analyst Wilson also observed **323-979-1250** had forty-two contacts with **262-352-0761,** the number associated with **Richard ROARK** between December 4, 2021, and January 4, 2022.

122.    On February 17, 2022, Analyst Wilson searched **323-979-1250** against telephone toll data of previously identified phone numbers associated with members of the drug trafficking organization.  Analyst Wilson determined **323-979-1250,** the number associated with **MOORE**, was contacted by **ARROYO** at the **630-453-3515** number on February 15, 2022.  Analyst Wilson Analyst Wilson also observed **323-979-1250** had thirty-nine contacts with **262-352-0761,** the number associated with **Richard ROARK** between December 4, 2021, and February 16, 2022.

123.    Case agents are aware that **323-979-1250,** the line associated with **MOORE,** had minimal contact with **ROARK** and **ARROYO** because **MOORE** was out of the country in Columbia, from January 6, 2022 through February 14, 2022.  Toll analysis conducted on the lines belonging to **ROARK** and **ARROYO** revealed that **MOORE** immediately reestablished

contact with both individuals when he returned to the United States. As outlined above, locational data being collected for **MOORE** allowed investigators to observe several meetings with **ROARK**, as well as link **MOORE** to the newly identified warehouse, located in Butler, Wisconsin.

124.    Your Affiant has reviewed toll analysis and electronic surveillance, in conjunction with reports of physical surveillance regarding **MOORE** and **323-979-1250**. Based upon your Affiant's training, experience and familiarity with the investigation, your Affiant believes that **323-979-1250** continues to be an active line utilized by **MOORE** for his drug trafficking operation, based on the high volume of activity, and the large number of common callers between lines previously associated with **MOORE**.   Additionally, your Affiant also was able to document a meeting between **MOORE** and **ROARK,** utilizing the collected locational data.

125.    I therefore believe that the above information establishes probable cause to believe that cell-site information for the **Target Cell Phones** continues to assist case agents in determining the location and activities of the participants of the DTO and produce evidence of violations of Title 21, United States Code, Sections 846 and 841, conspiracy to distribute controlled substances, and distribution of controlled substances.

## <u>Cell-Site Data</u>

126.    Based on my training and experience, I know that Service Providers can collect cell-site data on a prospective basis about the Target Cell Phones. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the

communication; and (5) the duration of the communication. I also know that wireless providers

such as the Service Providers typically collect and retain cell-site data pertaining to cellular

devices to which they provide service in their normal course of business in order to use this

information for various business-related purposes.

127.    Based on my training and experience, I know that the Service Providers can

collect per-call measurement data, which the Service Providers also refer to as the "real-time

tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a

cellular tower based upon the speed with which signals travel between the device and the tower.

This information can be used to estimate an approximate location range that is more precise than

typical cell-site data.

### E-911 Phase II / GPS Location Data

128.    I know that some providers of cellular telephone service have technical

capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data

or latitude-longitude data. E-911 Phase II data provides relatively precise location information

about the cellular telephone itself, either via GPS tracking technology built into the phone or by

triangulating on the device's signal using data from several of the provider's cell towers. As

discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific

geographic areas) that received a radio signal from the cellular telephone and, in some cases, the

"sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a

half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

Furthermore, the tower closest to a wireless device does not necessarily serve every call made to

or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

Based on my training and experience, I know that the Service Providers can collect E-911 Phase

II data about the location of the Target Cell Phones, including by initiating a signal to determine the location of the Target Cell Phones on the Service Providers' network or with such other reference points as may be reasonably available.

### Subscriber Information

129.     Based on my training and experience, I know that wireless providers such as the Service Providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phones' user or users and may assist in the identification of co-conspirators and/or victims.

### AUTHORIZATION REQUEST

130.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

131.     I further request that the Court direct the Service Providers to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

132.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phones would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

133.    Because the warrant will be served on the Service Providers, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

1.     Records and information associated with the following cellular devices assigned call numbers (referred to herein and in Attachment B as the "Target Cell Phones"):

      a.     **262-352-0761**, that is in the custody or control of Cingular Wireless, a wireless telephone service provider headquartered in West Palm Beach, Florida.

      b.     **630-453-3515,** that is in the custody or control of Verizon, a wireless telephone service provider headquartered in Bedminster, New Jersey.

      c.     **323-979-1250,** that is in the custody or control of Verizon, a wireless telephone service provider headquartered in Bedminster, New Jersey.

2.      The Target Cell Phones.

## ATTACHMENT B

### Particular Things to be Seized

**I.**         **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.     The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phones for the time period August 1, 2021, to the present:

    i.     Names (including subscriber names, usernames, and screen names);

    ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.     Local and long-distance telephone connection records;

    iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.     Length of service (including start date) and types of service utilized;

    vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

2

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phones for the time period August 1, 2021, to the present including:

    a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT")].

b. Information associated with each communication to and from the Target Cell Phones for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

3

ii.     Source and destination telephone numbers;

iii.    Date, time, and duration of communication; and

iv.     All data about the cell towers (i.e. antenna towers covering specific
        geographic areas) and sectors (i.e. faces of the towers) to which the Target
        Cell Phones will connect at the beginning and end of each communication
        as well as per-call measurement data (also known as "real-time tool" or
        "RTT").

c.      Information about the location of the Target Cell Phones for a period of 30 days
        during all times of day and night.  "Information about the location of the Subject
        Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude
        data, and other precise location information.

i.      To the extent that the information described in the previous paragraph
        (hereinafter, "Location Information") is within the possession, custody, or
        control of the Provider, the Provider is required to disclose the Location
        Information to the government.  In addition, the Provider must furnish the
        government all information, facilities, and technical assistance necessary
        to accomplish the collection of the Location Information unobtrusively
        and with a minimum of interference with the Provider's services,
        including by initiating a signal to determine the location of Target Cell
        Phone #2 on the Provider's network or with such other reference points as
        may be reasonably available, and at such intervals and times directed by
        the government.  The government shall compensate the Provider for
        reasonable expenses incurred in furnishing such facilities or assistance.

4

ii.       This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

## II.       Information to be Seized by the Government

All information described above in Section I that will assist in the investigation of **Samuel MOORE** and others regarding violations of Title 21, United States Code, Sections 841(a)(1) and 846.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in these Warrants.

5